IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jeannette Tucker, | ) | C/A No.: 1:18-592-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of Honorable Margaret B. Seymour, Senior United States District Judge, dated March 15, 2018, referring this matter for disposition. [ECF No. 5.] The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4.]

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she

applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

A.      Procedural History

On August 6 and September 17, 2014, Plaintiff protectively filed applications for DIB and for SSI in which she alleged her disability began July 15, 2002. Tr. at 285–310. Her applications were denied initially and upon reconsideration. Tr. at 168–77, 139, 153. On May 10, 2017, Plaintiff had a hearing by video before Administrative Law Judge ("ALJ") William Wallis. Tr. at 89–114 (Hr'g Tr.). At the hearing, Plaintiff amended her alleged onset date to December 21, 2013. Tr. at 91. As a result, the ALJ found Plaintiff forfeited her DIB claim, as her amended alleged onset date of disability was subsequent to her date last insured of June 30, 2010. Tr. at 91–92. The ALJ dismissed Plaintiff's DIB application and addressed her remaining claim for SSI. Tr. at 73. The ALJ issued an unfavorable decision on August 9, 2017, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 70–88. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 1, 2018. [ECF No. 1.]

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 60 years old at the time of the hearing. Tr. at 95. She completed high school. *Id.* She last worked part time as a housekeeper, which the ALJ found did not meet the standards for Substantial Gainful Activity ("SGA"). Tr. at 96. She alleges she has been unable to work since December 21, 2013. Tr. at 97.

2.     Medical History

On February 20, 2014, Plaintiff presented for a follow-up psychiatric medical assessment at Columbia Area Mental Health Center ("CAMHC") with her psychiatrist, Dr. Patrick Butterfield. Tr. at 468–69. Plaintiff reported she had been living with a friend for the prior year and stated she had applied for disability. Tr. at 468. Dr. Butterfield noted he had decreased Plaintiff's Latuda in October due to postural hypotension. *Id.* Plaintiff stated she had been out of Latuda for one week and noticed increased depression, but was taking the medication again and felt better. *Id.* Dr. Butterfield performed a mental status examination ("MSE"), which was unremarkable. Tr. at 468–69. He continued Plaintiff's diagnoses of major depressive disorder, recurrent, severe with psychotic features; alcohol dependence; and cannabis dependence and refilled her prescriptions for Paxil, Trazodone, and Latuda. Tr. at 469.

On March 19, 2014, Plaintiff presented to Dr. Butterfield for an emergency appointment due to increased depression and suicidal ideation. Tr. at 465–66. Plaintiff reported increased irritability and losing her temper with her two toddler grandchildren whom she cared for during the day. Tr. at 465. On MSE, Dr. Butterfield indicated Plaintiff exhibited sad faces, silent tears, and mild slowing of psychomotor functions; she spoke at a low rate of speed and volume and had no spontaneous speech; and she showed depressed mood, constricted affect, and distractible thought process. Tr. at 465–66. Dr. Butterfield increased Plaintiff's Latuda prescription and indicated she would continue with individual and group therapy. Tr. at 465.

On March 24, 2014, Plaintiff's CAMHC case manager, Anna House, summarized Plaintiff's progress from December 23, 2013, to March 23, 2014. Tr. at 435. Ms. House noted Plaintiff lived independently with her daughter and two of her grandchildren. *Id.* Plaintiff had been compliant in attending her prescribed therapy services and taking her medication. *Id.* However, Plaintiff had experienced an escalation of symptoms, including increased suicidal ideation and command hallucinations. *Id.* Ms. House indicated Plaintiff planned to meet her goal of feeling better by continuing to attend therapy sessions and to reduce her tendency to isolate herself by interacting with peers at least once per day. *Id.* Plaintiff reported a desire to stop avoiding her family and friends. *Id.* Ms. House noted Plaintiff expressed

increased confidence interacting with others until family turmoil three weeks prior that increased her desire to withdraw. *Id.* In addition, Ms. House stated Plaintiff continued to use marijuana five or more days per week. *Id.* Plaintiff reported difficulty controlling her anxiety without the use of marijuana. *Id.* Ms. House noted Plaintiff would begin attending a weekly substance abuse group to better understand how her marijuana use interacted with her mental health. *Id.*

On March 27, 2014, Plaintiff returned to Dr. Butterfield and reported the increased dosage of Latuda had decreased her hallucinations. Tr. at 461. However, Plaintiff indicated she had been taking more than Dr. Butterfield had prescribed and complained of lightheadedness and increased blood pressure. *Id.* On MSE, Dr. Butterfield noted Plaintiff exhibited only mildly-depressed mood, did not cry during the appointment, and endorsed decreased auditory hallucinations. Tr. at 462.

On April 24, 2014, Plaintiff followed up with Dr. Butterfield and reported feeling much better. Tr. at 457. She stated she left the house some, but that she still did not feel like herself. *Id.* She also indicated she was no longer experiencing dizziness or lightheadedness. *Id.* Plaintiff informed Dr. Butterfield she had not seen her primary care physician in over six months and had been off her hypertension medication. *Id.* On MSE, Dr. Butterfield

noted Plaintiff's mildly-depressed mood. Tr. at 458. He advised Plaintiff to continue her medications and therapy. *Id.*

On June 19, 2014, Ms. House summarized Plaintiff's progress from March 23, 2014, to June 21, 2014. Tr. at 436. Ms. House stated Plaintiff attended psychosocial rehabilitation programming two times per week and was living independently in the community with friends. *Id.* Ms. House indicated Plaintiff had shown improvement with medication compliance over the review period, but continued to struggle with a tendency to isolate herself. *Id.* Ms. House did not recommend any changes to Plaintiff's plan of care. *Id.*

On June 26, 2014, Plaintiff returned to Dr. Butterfield for a medication check and reported continued improvement. Tr. at 454–55. Dr. Butterfield noted a normal MSE. *Id.*

On September 19, 2014, Ms. House summarized Plaintiff's progress from June 21, 2014, to September 19, 2014. Tr. at 437. Ms. House noted Plaintiff continued to live independently in the community with friends, had recently received Medicaid benefits, and had complied with her treatment program. *Id.* Ms. House stated Plaintiff had improved in her ability to manage her symptoms, had not reported increased depression, and had not experienced command hallucinations during the review period. *Id.* However, Ms. House noted Plaintiff continued to use marijuana four or more times per

week. *Id.* Ms. House stated Plaintiff had shown progress in her ability to tolerate being with others and her communication skills and had less frequently reported feeling unsafe. *Id.* Ms. House suggested placing more emphasis on addressing Plaintiff's drug abuse in the upcoming treatment plan. *Id.*

On September 24, 2014, Plaintiff reported to Dr. Butterfield that she felt "great" and had been babysitting her grandchildren seven days a week. Tr. at 450. Dr. Butterfield noted a normal MSE. *Id.*

On December 3, 2014, Plaintiff complained of frequent headaches and requested a blood pressure check by a nurse at CAMHC. Tr. at 887. The nurse recorded Plaintiff's blood pressure as 160/100 and advised Plaintiff to make an appointment with the Eastover Clinic. *Id.*

On December 15, 2014, Plaintiff presented for a blood pressure check at Eastover Family Practice. Tr. at 896–97. Plaintiff reported having been out of blood pressure medication for over a year and complained of headaches, but denied blurred vision or chest pain. Tr. at 896. Plaintiff also reported more frequent urination. *Id.* The examining nurse recorded the following diagnoses: cardiovascular disorder, heart disease, with unsure diagnosis; hypertension; asthma; depression; and history of inappropriate sinus tachycardia, neurally medicated syncope, and heavy caffeine use. *Id.* Plaintiff reported she lived alone, smoked less than half a pack of cigarettes per day,

drank two cans of beer every other week, and occasionally used marijuana. *Id.* Plaintiff's blood pressure measured 141/94. Tr. at 897. The examining nurse assessed essential hypertension, ordered labs, restarted Plaintiff on Metoprolol, and instructed Plaintiff to monitor her sodium intake. *Id.*

On January 6, 2015, Dr. Butterfield noted Plaintiff had been attending therapy sessions four times per week since December and continued to babysit three of her young grandchildren. Tr. at 888. He indicated a normal MSE. *Id.*

On January 8, 2015, Ms. House summarized Plaintiff's progress from September 24, 2014, to December 23, 2014 and noted Plaintiff attended psychosocial rehabilitative services four days per week and received individual therapy approximately once per month. Tr. at 908. Ms. House indicated Plaintiff had been more interactive with peers and reported less isolation. *Id.* She opined this improvement was due to increased medication compliance related to Medicaid approval. *Id.* Ms. House stated Plaintiff continued to use marijuana three to five days per week, despite consistently attending her weekly co-occurring disorders group and submitting to random drug testing. *Id.*

On January 16, 2015, Dr. Jody Lenrow conducted a consultative mental RFC assessment. Tr. at 130–34. After reviewing Plaintiff's medical records, Dr. Lenrow concluded Plaintiff had the following medically determinable

impairments: Affective Disorder, primary, severe; and Alcohol, Substance, and Addiction Disorder, secondary, non-severe. Tr. at 130. Dr. Lenrow opined Plaintiff's affective disorder did not restrict her activities of daily living ("ADLs"); resulted in moderate difficulties in maintaining social function and concentration, persistence, or pace; and had resulted in one or two episodes of decompensation of extended duration. *Id.* Dr. Lenrow found Plaintiff's allegations credible and that Plaintiff was doing well, but experienced some increased symptoms when not compliant with her medications. Tr. at 131. She noted Plaintiff continued to use marijuana and indicated that could increase her symptoms. *Id.* Dr. Lenrow found Plaintiff's function intact based in part on her babysitting her grandchildren several days a week. *Id.* In sum, Dr. Lenrow found Plaintiff suffered from severe mental impairments, but appeared to be stable on medication and should be capable of at least simple tasks with limited public interaction. *Id.*

Dr. Lenrow's assessment specifically noted Plaintiff's sustained concentration and persistence limitations included moderate limitations in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods. Tr. at 133. In addition, Plaintiff's social limitations included moderate limitations in her ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Dr. Lenrow explained that, due to Plaintiff's mental conditions, she may have difficulty sustaining her concentration and pace on complex tasks and detailed instructions. Tr. at 134. However, Dr. Lenrow found Plaintiff could understand and remember instructions and should be able to attend to and perform simple tasks without special supervision. *Id.* Dr. Lenrow found Plaintiff could attend work regularly, but may miss a day occasionally due to her mental condition. *Id.* Dr. Lenrow indicated Plaintiff could relate appropriately to supervisors and coworkers, but may be better suited for a job that did not require regular work with the general public. *Id.* In addition, Dr. Lenrow found Plaintiff could make simple, work-related decisions and occupational adjustments; adhere to basic standards for hygiene and behavior; request assistance from others; protect herself from normal workplace safety hazards; and use public transportation. *Id.*

On January 29, 2015, Plaintiff followed up with Eastover Family Practice regarding her hypertension. Tr. at 898–99. Plaintiff reported doing well with medication and denied any new concerns or complaints. Tr. at 898. Her blood pressure measured 122/81. *Id.* The examining nurse indicated

Plaintiff had reached her goal blood pressure and directed her to continue taking her medicine. *Id.*

On March 20, 2015, Ms. House summarized Plaintiff's progress from December 23, 2014, to March 23, 2015. Tr. at 1005. Ms. House noted Plaintiff had become more active in initiating interactions with peers, but was still reporting some isolation, especially at home and when around strangers. *Id.* Ms. House reported Plaintiff continued to use marijuana regularly, demonstrate thinking errors, and make excuses about her drug use. *Id.*

On April 1, 2015, Dr. M. Jane Yates conducted a consultative mental RFC assessment in conjunction with the reconsideration of Plaintiff's initial denial. Tr. at 159–64. Dr. Yates considered some of Plaintiff's more recent medical records and Plaintiff's self-reportedADLs. Tr. at 160. Regarding her ADLs, Plaintiff indicated her condition limited her ability to work because she could not stay focused and experienced forgetfulness. *Id.* Plaintiff reported regularly caring for her grandchildren and her two pets. *Id.* She indicated she spent most mornings at the CAMHC "clubhouse," attending group therapy sessions. *Id.* She denied problems with personal grooming. *Id.* She stated she did not prepare meals; did some household chores; went outside daily; was not comfortable going out alone; only drove to group meetings; shopped in stores; could count change, handle a savings account, and use a checkbook or money order; read and did crossword puzzles; spent

time with groups at the clubhouse; regularly attended church; needed reminders to go places and someone to accompany her; and had no trouble getting along with family and friends. *Id.* In addition, Plaintiff reported she could pay attention for fifteen minutes; had problems completing tasks; did not follow written instructions well, but could follow simple, spoken instructions fairly well; got along with authority figures; could not handle stress or changes in her routine well; and did not like being around people. *Id.*

Dr. Yates concluded Plaintiff had limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Tr. at 162–64. Specifically, regarding Plaintiff's understanding and memory, Dr. Yates found Plaintiff had the ability to understand and remember simple and detailed work locations and procedures and would only need infrequent reminders of some of the detailed instructions due to intermittent difficulties in maintaining focus. Tr. at 164.

Regarding Plaintiff's sustained concentration and persistence, Dr. Yates noted moderate limitations in Plaintiff's ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 162–63. Dr. Yates concluded Plaintiff could maintain attention and concentration sufficient to perform simple, and a few detailed, tasks at an acceptable pace and quality for two-hour periods, over eight-hour workdays and forty-hour workweeks, under ordinary supervision, with no more than an infrequent missed day during the work months due to her mental impairment. Tr. at 164. In addition, Dr. Yates found Plaintiff could make simple decisions. *Id.*

Regarding social interaction, Dr. Yates noted Plaintiff exhibited moderate limitations in her ability to interact with the general public and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 163. Dr. Yates found Plaintiff could relate appropriately on a casual and limited basis with the general public, accept ordinary supervision, and relate appropriately to coworkers without being unduly distracted by them, or vice versa. Tr. at 164. In addition, she found Plaintiff could maintain acceptable behavior, hygiene, and dress in the workplace. *Id.*

Regarding adaptation, Dr. Yates noted Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. Tr. at 163. Dr. Yates found Plaintiff could adapt to the demands of a routine work setting, and respond appropriately to changes in such settings, protect herself

from normal workplace safety hazards, and use public transportation. Tr. at 164. In addition, she found Plaintiff could set reasonable goals and initiate action to carry them out and that she would benefit from infrequent encouragement. *Id.*

On July 29, 2015, Plaintiff attended a medication monitoring appointment with nurse Penny Reynolds at CAMHC. Tr. at 1155–56. Plaintiff reported the following medication side effects: fatigue, frequent urination, visual problems, diarrhea, and dry mouth. Tr. at 1155. Plaintiff stated she smoked one quarter pack of cigarettes, drank four to five Mountain Dews, and smoked two marijuana cigarettes per day. *Id.* Plaintiff reported living with her daughter in a trailer on her family's property and caring for her grandchildren. Tr. at 1156. Plaintiff stated she had been taking her medications as prescribed and benefitting from them and denied any side effects. *Id.* Plaintiff reported continued problems with her anxiety, including restlessness, disorganized thinking, and increased irritability. *Id.* Plaintiff reported a good appetite and denied sleeping problems. *Id.* However, she endorsed continued auditory hallucinations telling her to harm her grandchildren. *Id.*

On August 8, 2015, Plaintiff presented for a follow-up psychiatric medical assessment with Dr. Butterfield. Tr. at 1205–06. Dr. Butterfield noted Plaintiff had tested positive for marijuana on February 3, May 21, and

July 7, and was then-attending a drug treatment group three days a week. Tr. at 1205. Dr. Butterfield indicated a normal MSE and continued Plaintiff on her medication and therapy regimen. *Id.*

On September 16, 2015, Plaintiff's case manager administered a required functional assessment (DLA-20). Tr. at 1196–97. Plaintiff's responses to the questionnaire indicated she: dreamt about using marijuana, but denied urges or cravings; lived with an ex-boyfriend because she did not have anywhere else to go; did not pay rent, but contributed food to the house using her food stamps and performed chores; attempted suicide twice and was hospitalized after both attempts; slept a sufficient number of hours; only ate one meal per day and reported a poor appetite; received money from her children when needed, but had no other source of income; did well with independent problem solving; talked to her daughter and sister almost every day; enjoyed crossword puzzles, spending time with her grandchildren, and watching television; preferred to stay home and experienced anxiety around crowds; bathed and brushed her teeth daily; kept up her appearance and maintained grooming habits; and dressed appropriately for the weather in clean clothing. Tr. at 1196.

On November 19, 2015, Plaintiff had a follow-up psychiatric medical assessment with Dr. Butterfield. Tr. at 1186–87. Dr. Butterfield noted Plaintiff graduated from her alcohol abuse and drug treatment program that

day and expressed a desire to resume psychosocial rehabilitative services two days per week. Tr. at 1186. Dr. Butterfield noted Plaintiff appeared disheveled, but otherwise indicated a normal MSE. *Id.*

On January 11, 2017, one of Plaintiff's therapists noted she continued to exhibit isolating behaviors, persistent signs of anxiety, and hypervigilance. Tr. at 1147.

On January 18, 2017, in an individual therapy session with Veronica Johnson, Plaintiff reported running out of her medication for two days and described difficulties maintaining medication compliance since her Medicaid benefits were canceled. Tr. at 1143. Ms. Johnson recommended Plaintiff seek employment and Plaintiff indicated she earned money for her medications by babysitting her grandchildren four days per week. *Id.*

On February 3, 2017, Plaintiff had a follow-up psychiatric medical assessment with CAMHC psychiatrist Dr. John Billinsky. Tr. at 1139–40. Plaintiff indicated she was looking for work. Tr. at 1139. She reported a "pretty good" mood and that she was sleeping well, but endorsed a poor appetite. *Id.* Plaintiff declined any problems with her medication and stated she planned to resume attending church. *Id.* Dr. Billinsky performed an MSE and noted Plaintiff reported experiencing daily auditory hallucinations, but described them as "not as bad" as her prior hallucinations. *Id.* He also noted Plaintiff exhibited mildly impaired attention and concentration. *Id.*

On February 22, 2017, in an individual therapy session with Jennifer Dunbar, Plaintiff explained her roommate paid the bills and she provided food. Tr. at 1129. She indicated she spent most of her time at home, but also visited with her children and grandchildren. *Id.* She stated if she had a car, she would get out more. *Id.* Ms. Dunbar noted Plaintiff presented with a flat affect and exhibited some anxious behavior, but that she had a positive and peaceful attitude. *Id.*

On March 16, 2017, Ms. Johnson assessed Plaintiff's ADLs using a DLA-20. Tr. at 1152. Plaintiff reported a "happy" mood, good sleep, but poor appetite. *Id.* Ms. Johnson noted a normal MSE, except that Plaintiff endorsed occasional auditory hallucinations telling her to harm herself. *Id.* Plaintiff indicated she performed daily chores and other tasks without concern. *Id.* Ms. Johnson explained Plaintiff's score of 51 on the DLA-20 indicated mild impairments with independent strengths and that Plaintiff often required some help and routine support. *Id.* Specifically, Ms. Johnson noted Plaintiff exhibited marked disturbances in the following areas: housing stability, communication, community resources, social network, productivity, and grooming. *Id.*

On April 27, 2017, Plaintiff had a follow-up psychiatric medical assessment with Dr. Billinsky. Tr. at 33–34. Plaintiff reported living with a man in an air conditioned house. Tr. at 33. She indicated she was sleeping

well, but still had a poor appetite. *Id.* She stated her primary care physician had started her on Metformin. *Id.* Plaintiff reported walking on weekends for exercise, endorsed "pretty good" moods, and denied problems with her medications, but wondered about increasing her Trazodone. *Id.* On MSE, Dr. Billinsky noted Plaintiff reported ideas of reference, auditory hallucinations, and mild impairments in attention and concentration. *Id.* Dr. Billinsky increased Plaintiff's Trazodone and instructed her to follow up with him in four weeks. Tr. at 33–34.

On May 25, 2017, Plaintiff returned to Dr. Billinsky for a follow-up psychiatric medical assessment. Tr. at 41–42. Plaintiff stated she had been caring for her six grandchildren during the day. *Id.* She reported sleeping better and experiencing "pretty good" moods. *Id.* She indicated her appetite was fair, but that she had gained weight. *Id.* Plaintiff stated she was in good health and was walking most days for exercise. *Id.* She denied any problems with her medications. *Id.* On MSE, Dr. Billinsky found Plaintiff exhibited mild impairments in recent memory and concentration. *Id.*

On June 14, 2017, Plaintiff presented to CAMHC nurse Valerie D. Huguenin for medication monitoring. Tr. at 39–40. Plaintiff denied any psychiatric symptoms and noted side effects from her medications included diarrhea and dry mouth. Tr. at 39. Nurse Huguenin stated Plaintiff appeared alert and oriented, dressed appropriately for the weather, and in a good

mood. Tr. at 40. She indicated Plaintiff communicated clearly and effectively and reported taking her medications as prescribed. *Id.* Plaintiff denied suicidal or homicidal ideation, hallucinations, and attempts to harm herself or others. *Id.* She denied sleep disturbances and reported a good appetite. *Id.* Plaintiff stated her medications were working and expressed a desire to continue her medication regimen. *Id.* Nurse Huguenin found Plaintiff appeared stable. *Id.*

On July 20, 2017, Dr. Billinsky performed a follow-up psychiatric medical assessment. Tr. at 35–36. Plaintiff reported sleeping well, an improved appetite, good moods, and walking daily for exercise. Tr. at 35. She indicated she was enjoying time with her grandchildren, had been in good health, and was looking to get her own place to live. *Id.* Plaintiff denied problems with her medications and indicated the dosage was correct. *Id.* On MSE, Dr. Billinsky noted Plaintiff endorsed visual hallucinations, but stated the auditory hallucinations had decreased. *Id.* In addition, Dr. Billinsky noted mild impairments in Plaintiff's recent memory, attention, and concentration; listed her language below average; and indicated her judgment and insight were fair. *Id.* Dr. Billinsky continued Plaintiff's medications and instructed her to follow up with him in three months. Tr. at 36.

Notes from Plaintiff's group and individual therapy sessions during the applicable period reflect Plaintiff's progress in interacting and

communicating with others, struggles with continued marijuana use, and occasional periods of decompensation. *See* Tr. at 546–645; Tr. at 574, 579, 580 (describing increased symptoms on May 28, 2014 and June 11, 2014 when facing eviction); Tr. at 611–17 (reporting increased symptoms from March 12, 2014 to March 20, 2014, including command hallucinations, and requesting voluntary commitment); Tr. at 1074 (described as "in a dark place" and unprepared for group therapy on April 22, 2015, after reporting that her dog died and her disability claim was denied).

     C.    The Administrative Proceedings

        1.    The Administrative Hearing

           a.    Plaintiff's Testimony

At the hearing on May 10, 2017, Plaintiff testified she was 60 years old, single, and had completed high school. Tr. at 95. She testified she had major depressive disorder that kept her from working full-time, 40 hours a week. Tr. at 97. She testified being around people, including coworkers, made her nervous and anxious. *Id.* She testified she took medication for depression, including Paxil, Trazodone, and Latuda that she found helpful. Tr. at 99. She described drowsiness from her medications that caused her to fall asleep during the day three or four times a week. Tr. at 99–100. She denied having health insurance. Tr. at 100. She rated her memory as having declined, such that she would remember one or two out of five things. *Id.* She reported

spending most of her time reading, but could only focus or concentrate for a maximum of 30 minutes at a time, and she would have to start all over later because she would not remember what she previously read. Tr. at 100–01. She said she had a hard time reading a book, but might or might not be able to finish a magazine article. Tr. at 101. She stated it was uncomfortable to be around groups of people, including at a family function with her six kids, whom she is not around, as they are all grown. Tr. at 101–02. She reported that when she worked in housekeeping, it was at a school at night, when she did not have to interact with kids or teachers. Tr. at 102. She reported receiving food stamps and that she stayed at someone else's home. Tr. at 102–03. She reported no difficulties physically bathing or fixing hair, but that she lacked motivation and sat most of the week. Tr. at 103. She denied cooking anymore. *Id.* Plaintiff described a typical day as doing chores around the house and going outside to play with the dog. Tr. at 103–04. She thought if she had her own place, she could keep up with the regular cleaning. Tr. at 104. She reported giving up hobbies like crossword puzzles due to her health problems. *Id.* She said she spent time with her nine grandchildren, watching them play outside. *Id.* She stated she planned to start back to church after not having attended for over a year due to a lack of motivation. Tr. at 104–05. She reported sometimes having back pains that kept her in bed. Tr. at 105. She also reported that she used to hear voices, but that medicine helped. *Id.*

Plaintiff acknowledged having had trouble with alcohol and marijuana, but testified that it had been over a year since she last used marijuana and two years since she last consumed alcohol. Tr. at 105–06. She said she tried to find other things to stay busy like walking. Tr. at 106.

In response to her counsel's questions, Plaintiff reported having been hospitalized for a week for depression and thoughts of killing other people. Tr. at 107. She denied having had problems of harming herself or others since receiving medication. *Id.* She described the problems associated with her depression as including spending a lot of time by herself and avoiding crowds. *Id.* Plaintiff expressed concerns about her grandchildren, including whether they were all right and who was taking care of them. Tr. at 107–08. She said she would see her grandchildren when her children would transport her to see them. Tr. at 108. Plaintiff reported low self-esteem and said she felt good about herself maybe once or twice a week, but most of the time did not care. *Id.* She stated she attended one-hour private therapy sessions twice a week for counseling, which she thought helped. Tr. at 108–09. She felt "pretty good" the day of the hearing and planned to return home to tend to the housework she had not done in the morning, including cleaning the kitchen and bathrooms, mopping, and making the beds. Tr. at 109. She said she felt good physically, but not emotionally. *Id.* She denied leaving the house other than for therapy. Tr. at 109–10.

b. Vocational Expert Testimony

Vocational Expert ("VE") Jessie Ogren reviewed the record and testified at the hearing. Tr. at 110–13. The VE categorized Plaintiff's experience in housekeeping/cleaner as light and unskilled, with specific vocational preparation ("SVP") of 2 as *Dictionary of Occupational Titles* ("*DOT*") No. 323.687-014. Tr. at 111. The ALJ described a hypothetical individual of Plaintiff's vocational profile with no exertional limitations and the following mental restrictions: could understand, remember, and carry out simple tasks and instructions; sustain concentration, attention, and persistence on simple tasks; occasionally interact with supervisors, coworkers, and the general public; respond appropriately to routine workplace changes, but may miss an occasional day of work once every one to two months, due to her mental impairments. Tr. at 111–12. The VE testified the hypothetical individual would be able to perform the housekeeping/cleaner position. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. Tr. at 112. The VE identified the following medium, unskilled positions with SVP of 2: cleaner, *DOT* No. 381.687-018; hand packager, *DOT* No. 920.587-018; and laundry worker, *DOT* No. 361.684-014, with 1.5 million, 480,000, and 220,000 positions available in the national economy. *Id.*

The ALJ modified the hypothetical to further restrict the individual's ability to sustain concentration, attention, and persistence to one hour at a time, even on simple tasks and occasionally miss a day of work once every one to two weeks. Tr. at 112–13. The VE testified the hypothetical individual would not be able to perform the housekeeping/cleaner position or any other competitive employment. Tr. at 113.

### 2.  The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since August 6, 2014, the application date (20 CFR 416.971 *et seq.*).
2.  The claimant has the following severe impairments: affective/mood disorder and history of alcohol and marijuana abuse (20 CFR 416.920(c)).
3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to understand, remember, and carry out simple tasks and instructions, sustain concentration, attention, and persistence on simple tasks, and occasionally interact adequately with supervisors, coworkers, and the general public. She can respond appropriately to routine workplace changes, but may miss an occasional day of work, which is defined as once every one to two months, due to her mental impairments. In formulating this conclusion, I relied upon the State agency assessments at 2A and 10A, which are consistent with the above limitations.
5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on October 23, 1956, and was 45 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 6, 2014, the date the application was filed (20 CFR 416.920(g)).

Tr. at 76–83.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ wrongfully concluded that Plaintiff's mental impairments do not meet or medically equal Listing 12.04;

2) the ALJ failed to consider all of Plaintiff's impairments in combination to determine if they meet or medically equal a listed impairment;

3) the ALJ wrongfully concluded that Plaintiff is capable of performing work at a medium exertional level; and

4) the ALJ failed to find that Plaintiff meets a Grid Rule that would render her disabled.

[ECF No. 10 at 2.]

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing past relevant work ("PRW");[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Listings Analysis

Plaintiff argues the ALJ did not adequately consider whether her impairments met or were functionally equal to Listing 12.04, which covers

affective disorders.[3] [ECF No. 10 at 2.] She contends the ALJ's reliance on Plaintiff's ability to perform the same list of activities—tend to personal care and grooming, perform limited household chores, shop, count change, handle a savings account, use a checkbook/money orders, read, drive, solve crossword puzzles, attend church services, attend group meetings, and socialize with others—for each of the four paragraph "B" functional areas indicates he failed to consider all the record evidence. *Id.* at 3–4. In addition, Plaintiff asserts the ALJ failed to consider evidence that she satisfies the paragraph "C" criteria, including 2017 therapy notes suggesting Plaintiff experienced increased symptoms when attempting to interact with her peers at least once a day. *Id.* at 4.

The Commissioner argues the ALJ properly concluded the evidence did not support extreme or marked limitations in any of the paragraph "B" functional areas. [ECF No. 11 at 5.] The Commissioner further asserts the Fourth Circuit has considered a plaintiff's ability to perform similar activities supportive of disability denial and that Plaintiff's psychiatrist's notes support the ALJ's findings of mild or moderate limitations in the paragraph "B"

---

[3] The ALJ stated he also considered Listing 12.08, which covers personality and impulse-control disorders. *See* Tr. at 76. Listing 12.08 has distinct paragraph "A" criteria from Listing 12.04 and no paragraph "C" criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.08. However, the two Listings have identical paragraph "B" criteria. *Compare id.* § 12.08(B) *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(B). Plaintiff has not specifically asserted error in the ALJ's Listing 12.08 analysis.

functional areas. *Id.* at 5–6. Regarding the paragraph "C" criteria, the Commissioner maintains the record does not establish the level of functional impairment paragraph "C" requires. *Id.* at 7. In addition, the Commissioner contends Plaintiff has not "put forth [any] evidence of" the paragraph "A" criteria. *Id.* at 4–5.

"When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of [the claimant's] symptoms.'" *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172–73 (4th Cir. 1986)); *see also Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) (noting that "full explanation by the ALJ is particularly important" when "there is probative evidence strongly suggesting that [the claimant] meets or equals" a Listing).

The introduction to Listing 12.00 for mental disorders provides that "[t]he evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitations such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(a); *see also* 20 C.F.R. § 404.1525(c)(2) ("The

introduction to each body system contains information relevant to the use of the listings in that body system . . .”). To satisfy Listing 12.04, the individual's impairment(s) must satisfy the diagnostic criteria in the introductory paragraph and the criteria of both paragraphs “A” and “B” or “A” and “C.” *Id.*

An individual satisfies the paragraph “A” criteria by showing medical documentation of at least five of the following symptoms: depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, observable psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, or thoughts of death or suicide. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(A).

The ALJ did not make any specific findings regarding paragraph “A.” And, because the court finds the ALJ's listing analysis is supported by substantial evidence, it need not address the Commissioner's contention that Plaintiff also fails to satisfy the paragraph “A” criteria.

Paragraph “B” requires an individual to show an extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* § 12.04(B).

The ALJ found Plaintiff exhibited moderate limitations in understanding, remembering, or applying information because she could perform limited household chores, shop, count change, handle a savings account, use a checkbook/money orders, drive, read, solve crossword puzzles, attend church services, attend group meetings, and socialize with others. Tr. at 76. The ALJ also relied on the non-examining consultative examiners' findings that Plaintiff's ability to maintain concentration, persistence, or pace was only moderately impaired or not impaired. *Id.*

Similarly, the ALJ found Plaintiff exhibited moderate limitations in concentration, persistence, or maintaining pace based on the consultative examiners' findings and Plaintiff's ability to "tend to her personal care and grooming, shop, perform limited household chores, count change, handle a savings account, use a checkbook/money orders, read, drive, solve crossword puzzles, attend church services, and attend group meetings." Tr. at 77.

Based on the same ADLs, the ALJ found Plaintiff exhibited mild limitations in adapting or managing oneself. *Id.* In finding Plaintiff had moderate limitations in interacting with others, the ALJ relied on Plaintiff's ability to shop, drive, attend church services, attend group meetings, and socialize with others, in addition to Plaintiff's report of living with a roommate. Tr. at 76.

Plaintiff concedes that evidence of her ability to attend church services and group meetings, and to socialize with others may be relevant to her functional ability to interact with others, but asserts it is not relevant to the other three functional areas. [ECF No. 10 at 3.] Moreover, Plaintiff contends "the ALJ's reliance on these exact same activities to support his findings for all four areas of functioning provides strong evidence that Plaintiff was not given an individualized determination on each of these four areas." [ECF No. 12 at 3.] The Commissioner argues Plaintiff's group therapy sessions "often involved group tasks and homework assignments" and her "ability to maintain regular attendance and perform these activities demonstrated [her] ability to complete tasks, exercise judgment, work with others, and maintain a schedule, which are relevant factors in" the other mental functioning areas. [ECF No. 11 at 6.]

The court agrees with the Commissioner and finds the ALJ's paragraph "B" findings supported by substantial evidence. While the ALJ must clearly articulate the reasons for his decision regarding a listed impairment, "[a] cursory analysis at step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Stamey v. Berryhill*, No. 118CV00062FDWDSC, 2019 WL 937331, at *4 (W.D.N.C. Feb. 26, 2019) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)).

In his listing analysis, the ALJ explicitly relied on Dr. Lenrow's and Dr. Yates's consultative assessments and Plaintiff's self-reported ADLs. *See* Tr. at 76–77 (citing Exs. 2A (Consultative Assessment by Dr. Lenrow), 8A (Consultative Assessment by Dr. Yates),[4] 6E (Pl.'s Adult Function Report); Hearing Testimony). In his RFC analysis, the ALJ assigned the consultative assessments significant weight and further discussed the findings. Tr. at 80–81. Both Dr. Lenrow and Dr. Yates evaluated the paragraph "B" criteria and, at most, found moderate limitations in two of the four functional categories. *See* Tr. at 130, 159. They supported their findings with citations to the medical record and Plaintiff's reported ADLs. *See* Tr. at 130–31, 159–60. Further, the ALJ discussed notes from Plaintiff's regular check-ins with her psychiatrist from April 2014 through February 2017. *See* Tr. at 79. Over the course of those three years, Plaintiff's psychiatrists occasionally noted a mildly depressed mood and mild impairments in attention and concentration, but otherwise indicated normal MSEs. *See* Tr. at 469–69 (normal MSE), 465–66 (depressed mood, constricted affect, mild slowing of psychomotor functions, distractible thought process); 462 (mildly depressed mood); 458 (mildly depressed mood), 454–55 (normal MSE), 450 (normal MSE), 888

---

[4] The ALJ cites the exhibit numbers for Plaintiff's DIB claim, rather than her SSI claim. The consultative assessments for Plaintiff's SSI claim are exhibits 4A and 10A. However, the assessments are identical. *Compare* Tr. at 116–25 (Dr. Lenrow's Title II mental RFC) *with* Tr. at 127–36 (Dr. Lenrow's Title XVI mental RFC assessment) and Tr. at 140–52 (Dr. Yates's Title II mental RFC assessment) *with* Tr. at 154–66 (Dr. Yates's Title XVI RFC assessment).

(normal MSE), 1205 (normal MSE), 1186 (disheveled, but otherwise normal MSE), 1139–40 (mildly impaired attention and concentration), 1152 (normal MSE), 33 (mildly impaired attention and concentration) 41–42 (mildly impaired attention and concentration), 35 (mildly impaired recent memory, attention, and concentration).

Plaintiff points to evidence that she needed prompting to maintain focus in group therapy sessions "on multiple occasions" and that once, in January 2017, a therapist described Plaintiff as demonstrating signs of anxiety, including hypervigilance and constant leg shaking. [ECF No. 10 at 3.] However, Plaintiff does not explain how these examples demonstrate she is functionally impaired at the level required to satisfy Listing 12.04's paragraph "B" criteria. Plaintiff further relies on evidence from her psychiatric hospitalization in December 2012. [ECF No. 10 at 3–4.] That evidence falls outside of the relevant period and cannot properly be considered. Moreover, Plaintiff's medical records reveal significant improvement during the years following her hospitalization attributable to continued compliance with her medication and therapy regimen. Plaintiff's mental disorders appear to impact her ability to function and she continues to exhibit some symptoms, even with medication, but substantial evidence supports the ALJ's finding that Plaintiff has not shown the severe or marked limitations required under the Listing.

Paragraph "C" requires the individual's mental disorder to be "serious and persistent," which an individual can show through medical documentation demonstrating the disorder has existed for at least two years and evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the mental disorder; and (2) marginal adjustment, defined as minimal capacity to adapt to environmental changes or increased demands of daily life. *Id.* § 12.04(C).

The ALJ found no evidence supporting the second prong of the paragraph "C" criteria. Tr. at 77. Plaintiff asserts error in this finding because evidence in the record suggests Plaintiff experienced increased depressive symptoms and attempted to avoid others when tasked with interacting with peers once a day as part of her therapy. [ECF No. 10 at 4.] While Plaintiff significantly struggled with social interaction when she began therapy, the record suggests she has made significant progress in that regard. *See, e.g.*, Tr. at 437 (noting progress in ability to tolerate others and in communication skills), 908 (noting Plaintiff had been more interactive with peers and reported less isolation), 1005 (noting Plaintiff more active in initiating interactions, but still reporting some isolation), 624 (noting moderate progress in therapeutic socialization), 630 (serving as team leader in group therapy), 1147 (noting Plaintiff took on a "quiet leadership role,

demonstrating by example how to be productive" in her interpersonal skills training group), 32 (reporting she likes the therapeutic program because she gets to be around people). In addition, throughout her time at CAMHC, Plaintiff adapted to new groups, new therapists, and new situations at home without marked decompensation. *See, e.g.*, 1139–40 (new psychiatrist), 49 (coping well with life stressors, specifically ex-boyfriend's son then living in same house and acting negatively toward her), and 32 (new therapist). Thus, substantial evidence supports the ALJ's finding that Plaintiff could continue to function despite minimal increases in mental demands or changes in her environment.

2.      Combined Effect of Impairments

Plaintiff contends, while he properly identified her severe impairments, the ALJ failed to identify or consider her non-severe impairments and failed to consider the combined effect of all her impairments. [ECF No. 10 at 4–5.] Plaintiff asserts that, in addition to her severe impairments of major depressive disorder and alcohol and marijuana abuse, she suffers from hypertension, diabetes, asthma, schizophrenia, headaches, and a history of acute low back strain and that the ALJ did not mention any of those impairments in his decision. *Id.* at 5.

The Commissioner argues, other than hypertension, the record did not contain any evidence of Plaintiff's other alleged impairments and, thus, the ALJ properly declined to consider them in his analysis. [ECF No. 11 at 7–8.]

In reply, Plaintiff appears to acknowledge the lack of record evidence supporting her alleged non-severe impairments, except hypertension. [*See* ECF No. 12 at 5–6.] In addition, Plaintiff contends, despite recognizing alcohol and marijuana abuse as a severe impairment, the ALJ failed to consider it in combination with her major depressive disorder. *Id.*

In determining whether a claimant's physical or mental impairments are severe enough to support a finding of disability, an ALJ must consider the combined effect of all the claimant's impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. The combined effect of the individual's impairments should be considered at each stage of the disability determination process. *See id.* When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the

ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

The Fourth Circuit has declined to elaborate on what serves as adequate explanation of the combined effect of a claimant's impairments. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). However, this court has specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). Furthermore, absent evidence to the contrary, the courts should accept the ALJ's assertion that he has considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

At step two, after finding Plaintiff suffered from both affective/mood disorder and history of alcohol and drug abuse, the ALJ stated, "The severity of [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.08." Tr. at 76. In addition, the ALJ continued to discuss Plaintiff's alcohol and marijuana abuse in conjunction with her major depressive disorder throughout his RFC analysis. *Id.* at 78–81 (referring to multiple impairments throughout and specifically discussing evidence of both affective/mood disorder and history of alcohol and drug abuse). The court finds no evidence suggesting the ALJ did not, in fact, consider the combined effects of these two impairments and, thus, accepts the truth of the ALJ's assertion.

However, the ALJ does not discuss Plaintiff's hypertension at all, but focuses exclusively on Plaintiff's severe mental impairments. Plaintiff did not list hypertension in her disability application, *see* Tr. at 290, and neither she nor her attorney mentioned it at the hearing. In fact, Plaintiff testified her only condition was major depressive disorder and that, physically, she felt "pretty good." *See* Tr. at 97 (responding "No" when asked if she has any conditions other than major depressive disorder she would like to discuss), 109 (agreeing that physically she is "okay" and feels "pretty good").

While the record contains some evidence of Plaintiff's hypertension, it does not indicate that this condition impacted Plaintiff's ability to work. *See*

*Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (explaining "[t]he mere diagnosis . . . says nothing about the severity of the condition"). Nor does Plaintiff currently assert her hypertension negatively impacts her ability to work, only that the ALJ failed to consider the condition. "[T]he ALJ has no duty to consider an impairment absent an allegation of such impairment *and* record evidence of a resultant limitation or restriction." *Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D.N.C. Feb. 18, 2010) (emphasis added); *see also Wimberly v. Barnhart*, 128 F. App'x 861, 864 (3d Cir. 2005) ("The duty to evaluate a claimant's symptoms . . . does not extend to guessing what the impact of those symptoms may be. Rather, 20 C.F.R. 404.1512(c) and 20 C.F.R. 404.1545(a)(3) explicitly impose on the claimant the burden of furnishing evidence supporting the existence of a condition and the effect of that condition on the claimant's ability to work on a sustained basis."); 20 C.F.R. § 404.1512(c) ("[Claimant] must provide evidence . . . showing how the impairment(s) affects . . . functioning"). Having failed to produce any evidence of how her hypertension impacts her functioning, independently or in combination with her severe impairments, Plaintiff has failed to carry her burden and her argument on this issue lacks merit.

      3.     Exertional Limitations

Next, Plaintiff alleges the ALJ's finding that she can perform medium work contradicts the medical evidence. [ECF No. 10 at 5–6.] Specifically,

Plaintiff asserts "[h]er age and stature alone show that she is physically unable to lift fifty (50) pounds, even occasionally" and points to evidence that she strained her back in December 2012 after lifting something heavy. *Id.*

The Commissioner responds that substantial evidence supports the ALJ's finding because Plaintiff never received treatment for a physical impairment during the relevant period, did not base her disability claim on her back injury, and demonstrated normal gait at every relevant examination. [ECF No. 11 at 8.] Thus, the Commissioner asserts Plaintiff has not substantiated her subjective allegations of physical limitations with medical evidence.

Before determining whether a claimant is capable of performing her PRW or other work that exists in the economy, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). To adequately assess a claimant's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite

specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations). *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

At the hearing, the ALJ specifically asked Plaintiff about back pain. Tr. at 105. Plaintiff indicated she had back pain "sometimes but not all of the time" and that, when she did experience pain, it kept her in bed for a while. *Id.* Later, after describing the type of housework she performed, Plaintiff agreed she felt pretty good physically, except for occasional back pain. Tr. at 109. Medical records for the relevant period are devoid of any mention of pain or physical limitations. And, Plaintiff did not indicate her condition impacted her lifting ability on her functional report. Tr. at 376. Essentially, Plaintiff maintains the ALJ should have automatically limited her to light or

sedentary work based solely on her age (61), height (5'7"), and weight (170 lbs.).

To the contrary, in assessing RFC, the ALJ

must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights). Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC . . . .

Likewise, when there is no allegation of a physical . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

SSR 96-8p, 1996 WL 374184, at *2–3 (1996). Accordingly, Plaintiff's argument lacks merit.

4.    Grid Rule 202.04

Finally, Plaintiff argues the ALJ erred by failing to find her disabled pursuant to Grid Rule 202.04. [ECF No. 10 at 6.]

The introduction to Appendix 2 to Subpart P of Part 404, better known as the Medical-Vocational Guidelines or "Grid Rules," states as follows:

The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental

impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevent the performance of his or her vocationally relevant past work.

20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 200.00(a). Medical-Vocational Guideline 202.04 directs a finding of disability where the claimant is limited to light or sedentary work, of advanced age, has a high school education or less, and has no or only unskilled previous work experience. *Id.* § 202.04.

The ALJ properly found Plaintiff capable of medium work and, thus, did not err in finding Medical-Vocational Guideline 202.04 inapplicable and finding Plaintiff not disabled under Medical-Vocational Guideline 204.00's framework.

III. Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

April 15, 2019
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge